UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
GORDON MCGILL,

                Plaintiff,

     - against -

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                Defendant.
------------------------------------------------------------------X

**MEMORANDUM AND ORDER**
16-CV-4970 (RRM) (PK)

ROSLYNN R. MAUSKOPF, United States District Judge.

      Plaintiff Gordon McGill brings this action against defendant Nancy A. Berryhill, Acting

Commissioner of Social Security, pursuant to 42 U.S.C. § 405(g).  McGill seeks review of the

Commissioner's determination that McGill is not entitled to Disability Insurance Benefits

("DIB") under Title II of the Social Security Act (the "Act").  McGill maintains that the

Commissioner's determination is not supported by substantial evidence in the administrative

record.  (*See generally* Pl.'s Mem. (Doc. No. 17).)  Both McGill and the Commissioner have

moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure ("Rule")

12(c).  (Pl.'s Mem.; Def.'s Mem. (Doc. No. 19).)  For the reasons set forth below, McGill's

motion is granted in part, and the Commissioner's motion granted in part.

## BACKGROUND

### I.    Procedural History

      McGill applied for disability insurance benefits on June 18, 2012, alleging disability

since May 17, 2012, due to heart disease.[1]  (Admin. R. at 131–32, 154).  The Social Security

---

[1] McGill applied for supplemental security income disability benefits on June 18, 2012 as well, but was denied because of excess of income.  (Admin R. 55–59.)

Administration denied his application on February 12, 2013. (*Id.* at 51, 69–71.) McGill requested a hearing on March 15, 2013, (*id.* at 77), and on October 15, 2014, McGill appeared and testified with counsel before Administrative Law Judge Alan Berkowitz, (*id.* at 28–50). On October 30, 2014, the ALJ issued an unfavorable decision on McGill's hearing, finding that McGill was not disabled within the meaning of the Act. (*Id.* at 9–26.) On December 31, 2014, McGill requested that the Social Security Administration Appeals Council review the ALJ decision for remand or reversal. (*Id.* at 6.) On July 5, 2016, the Appeals Council denied McGill's request for review of the ALJ decision in a Notice of Action ("7/5/2016 Notice"). (*Id.* at 1.) The 7/5/2016 Notice specified that if McGill wished to appeal the Appeals Council's decision, then he must commence a civil action within 60 days of receiving the notice. (*Id.*) McGill now seeks review of the ALJ's determination.

## II.    Administrative Record

### a.    Non-Medical Evidence

McGill was born in 1960. (*Id.* at 131.) He is a high school graduate, and completed one year of college in 2010. (*Id.* at 155.) McGill worked as a Traffic Agent of the New York Police Department ("NYPD") from 1987 until 2012, and as Vice President of the Worker's Union from 1997 to 2012. (*Id.* at 155.) As an NYPD Traffic Agent, McGill directed traffic and issued summonses. (*Id.* at 182.) He worked eight hours per day for five days a week, and received an hourly pay rate of $13 per hour. (*Id.* at 155.) As part of his duties, McGill had to line up cones and lift and move objects to the correct place. (*Id.* at 182). On a form for the Social Security Administration, McGill explained that the job required him to walk for three hours, stand for five hours, and sit for one hour. (*Id.*) McGill checked off that the heaviest weight he lifted on the job

was 20 pounds, but, contradicting this assertion, he also checked off 50 pounds as the weight he "frequently lifted." (*Id.*)

As Vice President of the Workers' Union, McGill was a "field worker," which required him to act as a representative for union workers in hearings. (*Id.* at 45, 183.) In this role, he worked eight hours per day for two days a week, and received a yearly pay of $25,000. (*Id.* at 155.) McGill checked off that this job required him to sit and walk, but he did not indicate how many hours he was required to do so. (*Id.* at 183.)

McGill stopped working on May 17, 2012, when he suffered a heart attack. (*Id.* at 154.) Since then, McGill has reported pain in his chest, back, and shoulders. On July 22, 2014, the State of New York's Workers' Compensation Board Panel issued a decision, finding that McGill's heart attack was causally related to his work, and that there was a "100% temporary impairment." (*Id.* at 440.)

McGill received Workers' Compensation until July 30, 2014, and now applies for Disability Insurance Benefits due to his conditions. (*Id.* at 15, 28, 33.) In his Disability Report, McGill stated that he has high blood pressure, cannot walk for more than 10 minutes, stand for long periods, or lift heavy objects. (*Id.* at 164, 167.) He tires easily when walking and becomes lightheaded when he stands up. (*Id.* at 167.) His daily activities consist of eating, walking, and sleeping. (*Id.* at 180.) He used to cook every day, but no longer does, and relies on Ms. Lecky, with whom he lives, to prepare his meals instead. (*Id.* at 170, 179.) He is still able to feed himself. (*Id.* at 178.) He requires help performing household chores, and is unable to clean his house due to back pain, although he is able to make his bed and iron his clothes. (*Id.* at 179.)

Five months after his heart attack, McGill stated that he is able to shower and bathe without assistance, and that he bathes every two days, wears the same clothes for five days, and

cares for his hair every other week. (*Id.* at 43, 180.) He reported that he uses the toilet daily, and shaves every week and a half. (*Id.* at 178.) McGill cannot drive because sitting still makes him uncomfortable. (*Id.* at 179.) He does not shop, though he also stated that he goes to the store on a weekly basis. (*Id.* at 171, 172.) He cannot pay bills, but he is able to handle money, count change, and handle a savings account. (*Id.* at 171.) He watches television and reads every day, but not for long periods of time because it is difficult for him to stay focused. (*Id.* at 171.) McGill stated that he socializes with others every day in person or by telephone. (*Id.* at 172.) He goes to church every week. (*Id.* at 172.)

McGill also stated on the Function Report that since his heart attack, he could not walk for long periods, bend, or pick things up. (*Id.* at 180.) McGill described back and leg pain, as well as numbness in the back, neck, head, and chest, lasting 20 minutes at a time. (*Id.* at 174–75.) McGill stated that he feels pain when he sits for too long. (*Id.* at 176.) He cannot climb more than two flights of stairs, nor can he walk more than three blocks without resting for a period of 15 minutes. (*Id.* at 176, 177). He has difficulty kneeling and squatting due to back pain. (*Id.* at 176.) He can use his hands. (*Id.* at 176.) He can hear well, but his speech is "a little slow." (*Id.* at 176.) He has a short attention span, but is able to finish what he starts if he takes his time. (*Id.* at 177.) He also forgets things "all the time," and needs to be reminded twice. (*Id.* at 175.) He is able to follow both written and spoken instructions. (*Id.* at 177.) McGill noted on the form that he does not take any medication for pain, but testified at the hearing that he takes Ibuprofen. (*Id.* at 174, 37, 41.)

McGill testified before ALJ Alan Berkowitz on October 15, 2014. (*Id.* at 33–45.) He reported that he used to work as a traffic enforcement agent, but has not worked since last May 17, 2012, the day he suffered a heart attack while directing traffic. (*Id.* at 33–34.) After the heart

attack, McGill recovered in the hospital for two days, but he did not have to undergo cardiac rehabilitation.  (*Id.* at 35.)  He completed a stress test and did "okay," but was bedridden for two days after the test.  (*Id.* at 35.)  He claimed that he could not return to work due to the heart attack, high blood pressure, chest pain, shoulder pain, back pain, dizziness, headaches, nausea, shortness of breath, lack of focus, and weakness/fatigue. (*Id.* at 36, 38, 41, 43–44.)  He testified that he cannot lift more than five pounds due to hand numbness.  (*Id.* at 36, 38.)  He feels pain in his shoulders and back while sitting, and has "constant chest pains and pinching in [his] chest." (*Id.* at 36, 38.)  He testified that he cannot stand for a long period of time because his legs "give out on [him]."  (*Id.* at 38.)

McGill stated that he takes Atorvastatin for high cholesterol, Bystolic as a heart protector, Clopidogrel as a blood thinner, Losartan for high blood pressure, Lovaza for high cholesterol, and Nifedipine for high blood pressure.  (*Id.* at 166.)  He testified that in addition to the blood pressure medications and a muscle relaxer, he also takes "Ibuprofen, 800" for the pain in his back, shoulder and chest.  (*Id.* at 37, 41.)  He testified that the medications cause him dizziness, nausea, and rashes.  (*Id.* at 41.)  McGill stated that he mentioned to his doctors the side effects of the medications he was taking, but was told to "just keep taking the medication."  (*Id.* at 42.) McGill testified in his ALJ hearing that his doctors recommended that he start swimming and see a psychiatrist.  (*Id.* at 38, 42.)  He testified that he has not yet seen a psychiatrist but is scheduled to see one for his coronary artery disease and depression. (*Id.* at 42.)

### b.  Medical Evidence On and After Plaintiff's Alleged Onset Date of May 17, 2012

On May 17, 2012, McGill suffered a heart attack and was rushed to the hospital, where he had an "emergency left heart cardiac cath[eterization]" and stent placement.  (*Id.* at 202, 235,

324.)  The catheterization revealed that the left anterior descending artery had "mild luminal irregularities" and the "D2 had 40% disease."  (*Id.* at 215.)  The left circumflex artery had "100% occlusion of OM-2 at the ostium."  (*Id.* at 215.)  The right coronary artery had "40% proximal RCA disease with 60% RCA lesion."  (*Id.* at 215.)  McGill was diagnosed with "acute anterior myocardial infa[rction], myocardial infarction of other anterior wall."  (*Id.* at 202, 229.)  A stent was placed in the circumflex artery, which reduced occlusion of the OM-2 artery to zero percent.  (*Id.* at 217, 365.)  Upon discharge, he was educated about coronary artery disease, and was advised to take his medication as instructed.  (*Id.* at 202–03.)  He was put on a low sodium, low cholesterol diet.  (*Id.*)  The discharge instructions note that McGill will be able to engage in a "gradual increase in activity."  (*Id.* at 202.)

Two weeks after his heart attack, on May 30, 2012, McGill followed up on an outpatient basis with Eugene Khait, M.D., a cardiologist at SUNY Downstate Medical Center, University Hospital of Brooklyn.  (*Id.* at 200–01.)  An electrocardiogram ("EKG") showed T wave abnormalities.  (*Id.* at 201.)

Below is a summary of the results of McGill's doctors' visits subsequent to his heart attack on May 17, 2012.  Throughout McGill's visits with doctors, he was diagnosed with multiple medical ailments, including hypertension, coronary artery disease ("CAD"), obesity, dyspnea, and asthma.  (*Id.* at 234, 242, 267, 318, 327, 361, 366, 404–05, 435, 459.)  He often experienced chest pain, shortness of breath, weakness, dizziness, left hand numbness, fatigue, headaches, and nausea.  (*Id.* at 242–44, 264, 337, 372, 403, 459.)  Several doctors determined that McGill would be able to return to work.  (*Id.* at 236, 336, 460.)

### i. Oleg Lushpenko, M.D., Physician (January 2010 – October 2013)

McGill began seeing Dr. Oleg Lushpenko as his primary care physician on January 29, 2010. (*Id.* at 157, 234.) Dr. Lushpenko diagnosed McGill with poor to moderately controlled hypertension, CAD, and status post-myocardial infarction. (*Id.* at 234.) He found that McGill's heart attack had been "very mild." (*Id.* at 235.) Dr. Lushpenko noted McGill has some chest discomfort, "but not pain," and is fatigued. (*Id.* at 234, 236.) Dr. Lushpenko was unable to comment on any laboratory findings as he did not have any copies of the results or reports, and thus referred those questions to the cardiologist. (*Id.* at 234, 236, 238.) He believed McGill would be able to return to work "some time in November." (*Id.* at 236.) Regarding McGill's ability to perform work-related physical activities, Dr. Lushpenko opined that the maximum weight McGill could lift was 10 pounds, and that McGill could do so frequently. (*Id.* at 239). Dr. Lushpenko also found that McGill could stand and/or walk up to six hours per day, and that he was limited in his ability to push and/or pull. (*Id.*)

In a questionnaire completed on October 7, 2013 for a New York State office, Dr. Lushpenko again diagnosed McGill with hypertension and poorly controlled coronary artery disease. (*Id.* at 387.) He further noted both of these conditions were lifelong problems. (*Id.* at 288.) Dr. Lushpenko revised his earlier assessment and determined that the most McGill could lift was 20, rather than 10, pounds, but could do so only occasionally. (*Id.* at 390.) He further noted that McGill was limited in pushing and/or pulling with his upper extremities. (*Id.*)

### ii. Dov Shmukler, M.D., Cardiologist (July 2012 – October 2013)

McGill was first referred to Dr. Dov Shmukler on July 19, 2012. (*Id.* at 242, 392.) On that visit, McGill reported that he did not experience any chest pain or dyspnea on exertion, and

no palpitations.  (*Id.* at 315.)  He also reported that he experienced headaches, but he felt better with the prescribed medication, and felt worse with excessive salt in his diet.  (*Id.*)

Dr. Shmukler found that McGill had suffered from a myocardial infarction, and has CAD, status post angioplasty with coronary stent and hypertension.  (*Id.* at 318, 327, 361, 366.) McGill's medication included 40 milligrams of Lipitor, 75 milligrams of Plavix, and 81 milligrams of aspirin per day.  (*Id.* at 317, 326, 360, 365.)  Dr. Shmukler determined that McGill "is currently clinically stable except for elevated blood pressure."  (*Id.* at 317.)  Dr. Shmukler noted McGill was "currently stable from [a] coronary artery disease perspective," and instructed him to "continue [his] current medical regimen" and to "continue Plavix for one year."  (*Id.* at 318, 327, 361, 366.)  Dr. Shmukler reviewed McGill's EKG with him, and noted "sinus rhythm, nonspecific T wave abnormality."  (*Id.*)  Dr. Shmukler commented that McGill reported "feeling weak and sluggish," and that "his heart rate is 57 today, and he is on a beta blocker."  (*Id.*)  Dr. Shmukler decreased the beta blocker dose, and changed some of McGill's medications to better control his blood pressure.  (*Id.*)

At an August 2, 2012 appointment, Dr. Shmukler again stated that McGill "is currently clinically stable except for elevated blood pressure."  (*Id.* at 329.)  He noted that McGill's coronary artery disease was "stable," and that he was to "continue his current medical regimen." (*Id.* at 329–30, 380–81.)  Dr. Shmukler also added a calcium channel blocker to his medication regimen.  (*Id.*)  He noted that McGill felt "weak and unable to perform his work duties," so he "advised him to stay home until reassessment during [the] next visit."  (*Id.*)

At an October 18, 2012 appointment, McGill complained of fatigue, dyspnea on exertion, and chest pain that is "reproducible over the left side of the chest."  (*Id.* at 331, 378.)  He also complained of high blood pressure.  (*Id.*)  Dr. Shmukler noted that McGill exhibited "overall

good blood pressure control," and that McGill should continue his current medical regimen. (*Id.* at 332, 379.) He determined that McGill had "atypical chest pain," and was "unable to go back to work at this time" as "[h]e feels weak." (*Id.* at 332, 379.)

On October 24, 2012, Dr. Shmukler completed a questionnaire at the request of the New York State Office of Temporary and Disability Assistance Division of Disability Determinations. (*Id.* at 241–46.) Dr. Shmukler listed McGill's diagnoses as chronic CAD and status post-myocardial infarction. (*Id.* at 242.) He reported that McGill's symptoms included fatigue, shortness of breath on exertion, and left side chest pain, brought on by exertion and relieved by rest. (*Id.* at 242–44.) He also reported that McGill could not walk more than one to two blocks without becoming short of breath. (*Id.* at 245.) Dr. Shmukler opined that McGill was limited to lifting and carrying five pounds occasionally, and to standing or walking up to two hours per day with limited ability to push or pull. (*Id.* at 245–46.)

At a November 19, 2012 appointment, Dr. Shmukler noted that McGill's symptoms included fatigue, dyspnea on exertion, and left side chest pain. (*Id.* at 335–36, 376–77.) Dr. Shmukler found that McGill also suffers from obesity and dyspnea. (*Id.*) He stated that McGill "still complains of weakness and dyspnea on exertion and the EKG showed diffuse nonspecific T wave abnormalities." (*Id.* at 336, 377.) While McGill showed "signs of improvement," Dr. Shmukler "advised him to stay off work for another month," but noted that McGill might be able to return to work "in mid-December." (*Id.* at 336.)

At a January 14, 2013 visit, Dr. Shmukler again found that McGill's symptoms included fatigue, dyspnea on exertion, left side chest pain which is reproducible over the left side of the chest, and high blood pressure. (*Id.* at 337, 372.) He further determined that McGill's CAD was

stable, but that his blood pressure was elevated, which warranted administration of clonidine. (*Id*. at 338, 373.)

Dr. Shmukler saw McGill two months later on March 22, 2013, and reported that McGill was "currently stable," though he "still complains of dyspnea on exertion" and "significant fatigue after standing or walking for a few blocks." (*Id.* at 308–11, 339–41, 352–54, 368–70.) On April 26, 2013, McGill complained of "significant dyspnea" on exertion "after walking less than one block." (*Id.* at 308.) Dr. Shmukler advised McGill to "continue [his] current medical regimen," and to start a diet and exercise program. (*Id.*)

Dr. Shmukler completed an updated questionnaire on October 21, 2013, listing McGill's diagnoses as CAD, myocardial infarction, and status post cardiac surgery with stent. (*Id.* at 392–93.) McGill's symptoms included dyspnea on exertion, including after walking two to three blocks, and fatigue. (*Id.* at 392, 395.) Dr. Shmukler indicated that McGill's CAD and myocardial infarction are chronic conditions. (*Id.* at 393.) Dr. Shmukler also revised his earlier opinion that McGill could lift only five pounds and found that McGill could occasionally lift and carry 10 pounds up to one-third of a workday, stand and/or walk up to six hours per day, and that he was limited in pushing and/or pulling. (*Id.* at 395–96.)

### iii. Lev Aminov, M.D., Internist (March 2013 – August 2014)

Dr. Lev Aminov, an internist, first treated McGill on March 18, 2013, and saw him seven times through August 14, 2014. (*Id.* at 397–434.) On McGill's first visit, Dr. Aminov noted McGill's complaints of "shortness of breath on exertion, chest pain, tightness of the chest on mild exertion, headaches, and dizziness." (*Id.* at 403.) There were no "acute changes" to McGill's EKG, and a spirometry test dated March 18, 2013 showed "severe obstruction." (*Id.* at 404–05.) In his Initial Report submitted to the Workers' Compensation Board, Dr. Aminov

found that McGill's "prognosis is guarded," that McGill was "currently totally disabled," and that in his "professional opinion, the patient's symptoms are causally related to the work related accident of 5/18/12." (*Id.*) Notably, Dr. Aminov also wrote down that McGill was "not in acute distress." (*Id.* at 403.) Dr. Aminov explained McGill was a "patient with preexisting hypertension" and was "under stress directing traffic." (*Id.*) Dr. Aminov further noted that McGill had been speaking with "a misbehaving driver" on the date of the heart attack, which "caused constriction of blood vessels in the heart due to release of adrenaline into the blood." (*Id.*)

On December 4, 2013, a resting EKG demonstrated regular sinus rhythm and ST-T wave abnormalities. (*Id.* at 415.) McGill was able to exercise for seven minutes and 35 seconds, "demonstrating good exercise capacity." (*Id.*) The EKG "did not meet ischemic criteria because" there was "no deviation [in the ST-T wave] from resting pattern." (*Id.*) The EKG further showed a global ejection fraction of 46%, as well as "[n]o wall motion abnormalities." (*Id.* at 416.) Doctor Schulze, who analyzed the results and sent them to Dr. Aminov, concluded that "[n]o abnormal findings were identified on gated cardiac SPECT perfusion exam." (*Id.*)

In subsequent visits through August 2014, Dr. Aminov repeatedly noted that McGill complained of shortness of breath on exertion, chest pain, tightness of the chest on mild exertion, headaches, and dizziness. (*Id.* at 403, 409, 419, 423, 427, 433.) On August 14, 2014, Dr. Aminov reported that the EKG dated August 14, 2014 showed "Syn R, depressed T waves V5-V6." (*Id.* at 432.) Dr. Aminov further stated that McGill's "condition is permanent in nature." (*Id.* at 432.) He added that McGill requires his family's help with shopping and cooking. (*Id.*)

On August 14, 2014, Dr. Aminov completed a Doctor's Report and found that McGill had reached "Maximum Medical Improvement," and that he had a "permanent impairment." (*Id.*

at 430.)  Dr. Aminov stated that McGill was occasionally limited in lifting/carrying, pushing/pulling, sitting, standing, walking, simple grasping, fine manipulation, reaching overhead, reaching at/or below shoulder level, and driving a vehicle.  (*Id.* at 431.)  He rated McGill's exertional activity at "less than sedentary work," stated McGill could not perform his work activities with restrictions, and found that he would not benefit from vocational rehabilitation.  (*Id.*)

### iv.  Kevin T. Custis, M.C., Family Medicine Doctor (April – July 2014)

From April to July 2014, McGill visited Dr. Kevin Custis to treat his glucose intolerance and CAD.  (*Id.* at 435.)  Dr. Custis performed cardiac testing on McGill on April 28, 2014.  (*Id.* at 437.)  The results of the tests revealed trace mitral regurgitation, mild aortic regurgitation, trace tricuspid regurgitation, and trace pulmonary regurgitation.  (*Id.* at 437–38.)  On July 29, 2014, Dr. Custis diagnosed McGill with CAD and glucose intolerance.  (*Id.* at 435.)  In a Treating Physician's Wellness Plan Report completed for the New York City Human Resources Administration ("NYC HRA"), Dr. Custis noted McGill was "stable and compliant with medications" and checked off that McGill was "unable to work for at least 12 months."  (*Id.* at 436.)  Dr. Custis prescribed Losartan, metoprolol, clopidogrel, amlodipine, aspirin, atorvastatin, fenofibrate, and folic acid.  (*Id.* at 435.)

Dr. Custis completed a Cardiac Medical Source Statement for the NYC HRA on July 30, 2014, in which he indicated that McGill's diagnosis was CAD, with symptoms of chest pain, weakness, chronic fatigue, and dizziness.  (*Id.* at 459.)  McGill's chest pain was reported as a "sharp pinch across [the] chest [that] radiates from left [to] right," and occurs every day.  (*Id.*)  He noted that McGill must rest for about 20 minutes following his chest pain.  (*Id.* at 460.)  Dr.

Custis noted that McGill was "responsive to treatment" but did "experience nausea and dizziness" from his medication, and that stress sometimes "trigger[ed] chest discomfort." (*Id.*) Dr. Custis noted that McGill was "capable of low stress work," and that his "physical symptoms and limitations cause[d] emotional difficulties such as depression or anxiety" as he "is unable to care for his family or support them as he previously was" and that these emotional factors contribute to the severity of his symptoms and functional limitations. (*Id.*) Dr. Custis checked off that McGill's impairments lasted or could be expected to last at least 12 months. (*Id.*)

As part of the Cardiac Medical Source Statement, Dr. Custis found that if "placed in a competitive work situation," McGill's functional limitations would be restricted to walking three to four city blocks without rest, sitting, standing or walking less than two hours in an eight-hour workday, shifting positions at will from standing, sitting, or walking, and unscheduled 15 minute breaks every hour during the work day. (*Id.* at 460–61.) Dr. Custis checked off that McGill would be "capable of low stress work." (*Id.* at 460.) He noted that in a competitive work situation, McGill would be able to lift and carry less than 10 pounds frequently, 10 pounds occasionally, and 20 pounds rarely, but that he would never be able to carry 50 pounds. (*Id.* at 461.) He further noted that McGill would be able to twist, stoop, crouch, and squat occasionally, rarely climb stairs, and never climb ladders. (*Id.*)

Dr. Custis also recommended that McGill avoid "all exposure" to cigarette smoke, "even moderate exposure" to extreme cold and extreme heat, and "concentrated exposure" to high humidity, soldering fluxes, solvents/cleaners, and fumes, odors, and gases. (*Id.* at 461.) Dr. Custis recommended "no restrictions" on wetness, perfumes, and chemicals. (*Id.*) Dr. Custis further noted that for 20 percent of the typical workday, McGill's "symptoms [would] likely be

severe enough to interfere with attention and concentration needed to perform even simple work tasks." (*Id.* at 463.)

### v. Jerome Caiati, M.D., Consultative Examiner, Internal
### Medicine (December 2012)

On December 11, 2012, Dr. Jerome Caiati performed a consultative examination on McGill. (*Id.* at 264–72.) McGill reported asymptomatic hypertension, history of infarction with post infarction chest pain, asthma, back pain, left arm numbness, headaches, and dizziness. (*Id.* at 264.) In Dr. Caiati's examination, McGill appeared to be in no acute distress, and his gait was normal. (*Id.*) McGill was able to walk on his heels and toes without difficulty, he was able to squat fully without holding anything, his stances were normal, he needed no help changing for the exam or getting on and off the exam table, and he was able to get up from the chair without difficulty. (*Id.*)

Dr. Caiati's diagnoses and prognoses included: (1) obesity – fair with diet and weight loss; (2) hypertension with blood pressure uncontrolled – fair with diet, weight loss, and medication adjustment; (3) asthma – fair with continued cessation of smoking, weight loss, and medication when necessary; (4) back pain – no prognosis; (5) left arm numbness – no prognosis; (6) headaches – fair with analgesics when necessary; (7) dizziness – no prognosis; and (8) myocardial infarction with post myocardial infarction chest pain – no prognosis. (*Id.* at 267.) He noted that McGill's prognoses for obesity, hypertension, and back pain were "fair with diet and weight loss." (*Id.*) Dr. Caiati further noted McGill was unrestricted in sitting, standing, walking, reaching, pushing, pulling, and climbing, although there was minimal limitation for bending and lifting due to lower back pain. (*Id.*)

### vi. Leonie Mitchell, L.M.S.W., Social Worker (November 2014)

On November 24, 2014, about two months after the ALJ's decision, McGill went in for a mental health assessment with Mitchell. (*Id.* at 471–89.) McGill complained of depression, and described his "lack of energy" and his feeling that he was "abandoned by his job." (*Id.* at 472.) Mitchell found that McGill had moderate depression and anger, but that he showed no signs of suicidal behavior. (*Id.* at 473, 485.) Mitchell concluded that no immediate psychiatric evaluation was necessary. (*Id.* at 471.)

### c. Vocational Expert Testimony

Vocational Expert ("VE") Andrew Vaughn testified at the administrative hearing. (*Id.* at 46.) VE Vaughn testified that McGill had previously worked as an NYPD traffic police officer, which is listed as "medium with an Specific Vocational Preparation ("SVP") of 6 with it being performed at the light level." (*Id.* at 46.) He explained that traffic control is considered light because the officer has to stand in order to manage the flow of traffic. (*Id*. at 47.) He also noted that if the job was primarily performed seated as opposed to standing, the use of the arms or foot controls would be considered light. (*Id.* at 47.)

McGill's counsel asked VE Vaughn whether working as a traffic control agent is considered to be a stressful position. (*Id.* at 48.) VE Vaughn replied that the Dictionary of Occupational Titles ("DOT") "typically looks at stress related to health and hazard and prevention of harm to self and people around and a traffic officer would definitely fall into that category." (*Id.* at 48–49.) He continued that under the DOT, this is a "specific category called temperaments and it gives you a letter grade that says if the job is stressful or not and the DOT is S and the traffic controller has that S category." (*Id.* at 49.) VE Vaughn concluded that "performing under stress or if confronted with emergency is critical, unusual and dangerous

situations." (*Id.*) VE Vaughn further agreed that this would be a similar level to a police officer. (*Id.*)

**STANDARD OF REVIEW**

**I.      Review of Denial of Social Security Benefits**

Unsuccessful claimants seeking disability benefits under the Act may seek judicial review of the Commissioner's decision by bringing an action in federal district court "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 405(g). However, the Court does not make an independent determination about whether a claimant is disabled when reviewing the final determination of the Commissioner. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). The Court reviews "the administrative record *de novo* to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) (internal quotations and citations omitted). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks omitted). "If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld." *Stemmerman v. Colvin*, No. 13-CV-241 (SLT), 2014 WL 4161964, at *6 (E.D.N.Y. Aug. 19, 2014) (citing 42 U.S.C. § 405(g)). "This deferential standard of review does not apply,

16

however, to the ALJ's legal conclusions." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010). Rather, "[w]here an error of law has been made that might have affected the disposition of the case . . . [an ALJ's] failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).

## II.        Eligibility Standard for Disability Insurance Benefits

To establish eligibility for DIB, an applicant must produce medical and other evidence of disability. *See* 42 U.S.C. § 423(d)(5)(A). To be found disabled, the claimant must have been unable to work due to a physical or mental impairment resulting from "anatomical, physiological, or psychological abnormalities, which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(1)(A). This impairment must have lasted or be expected to last for a continuous period of not less that 12 months. *Id.*; *see also Barnhart v. Walton*, 535 U.S. 212 (2002). Further, the applicant's medically determinable impairment must have been of such severity that he is unable to do his previous work or, considering his age, education, and work experience, he could not have engaged in any other kind of substantial gainful work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, the Commissioner engages in the following five-step analysis:

> [1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> [2] If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.
>
> [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is

listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.

[4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

[5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera*, 697 F.3d at 151 (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); 20 C.F.R. § 404.1520. The claimant has the burden of proof for the first four steps of the analysis, but the burden shifts to the Commissioner for the fifth step.  *See Talavera*, 697 F.3d at 151.

## DISCUSSION

### I.    The ALJ's Decision

First, the ALJ determined that McGill had not engaged in substantial gainful activity since May 17, 2012, the alleged onset date.  (Admin R. at 154.)  Second, the ALJ found that McGill's status-post myocardial infarction, satisfied the "severe impairment condition."  (*Id.* at 14.)  He also found that McGill's high blood pressure, diabetes and obesity were non-severe impairments.  (*Id.*)  Acknowledging that obesity is considered an impairment, the ALJ found no indication in the record that McGill's "obesity is a significantly limiting factor."  (*Id.* at 15.)  Similarly, the ALJ noted that McGill's blood pressure appears "to be under control," and that there is no evidence that any diabetes or pre-diabetes McGill may suffer from "will cause more than minimal work-related limitations."  (*Id.*)  Third, the ALJ found that McGill's impairments did not meet the criteria of a severe impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ then evaluated McGill's residual functional capacity ("RFC"), a measure of the most McGill can do despite his impairments. In determining the RFC, the ALJ must consider all medical opinions together with other relevant evidence. 20 C.F.R. § 404.1527. Here, the ALJ found that McGill has the RFC to perform the full range of light work as defined in 20 C.F.R. 404.1567(b). To determine McGill's RFC, the ALJ gave "great weight" to Dr. Lushpenko, "some weight" to Dr. Shmukler and Dr. Caiati, "little weight" to Dr. Custis, and no weight to Dr. Aminov. (Admin R. 20–21.) Dr. Lushpenko, who saw McGill between October 2010 and October 2013, found that McGill could lift up to 20 pounds and could return to work in November 2012. (*Id.* at 236, 390.) Similarly, Dr. Shmukler noted in November 2012, just six months after McGill's heart attack, that McGill could return to work "in mid-December." (*Id.* at 336.) He consistently found that McGill's condition was "stable" and urged McGill to start a diet and exercise program. (*Id.* 338, 373, 308–11.) In contrast to Dr. Lushpenko's conclusion, Dr. Shmukler noted that McGill was limited to lifting 10 pounds, but does not provide any medical reason for this restriction.

Dr. Caiati found that McGill's restrictions on lifting and carrying were merely "mild." The ALJ rejected this determination, finding that McGill's restrictions were greater than mild. (*Id.* at 21.) During the examination with Dr. Aminov, McGill was able to exercise seven minutes and 35 seconds, "demonstrating good exercise capacity." (*Id.* at 415.) Even so, Dr. Aminov found that McGill was limited to "less than sedentary" work. Given that his own chart did not support this restriction, the ALJ gave Dr. Aminov's findings no weight. (*Id.* at 21.) Additionally, though Dr. Aminov concludes that McGill is "totally disabled," this terminology is specific to the Workers' Compensation Program, and does not "represent a function by function assessment of" McGill's capacity to perform certain work-related activities as the Social Security

Administration requires. (*Id.* at 21.) Dr. Custis determined that McGill would be limited to sitting less than two hours per working day and would need 15-minute breaks every hour during the workday. (*Id.* 460–61.) The ALJ gave only little weight to these findings, however, and noted that there was no evidence in the record to support the restriction on sitting.

Doctors Lushpenko, Shmukler, and Custis all determined that McGill would be able to return to work, though Dr. Custis noted that McGill should return to low-stress work. Multiple doctors found that McGill was in stable condition, and even Dr. Aminov, who wrote that McGill was "totally disabled," found that McGill demonstrated "good exercise capacity" and that a gated cardiac SPECT perfusion exam revealed "no abnormal findings." (*Id.* 415, 416.) Based on this record evidence, the ALJ found that McGill could perform "light work."[2]

At step four, the ALJ determined that McGill could return to his past relevant work as a traffic control agent because he performed it at the light level.[3] (Admin R. at 22.) Having found that McGill can perform past relevant work, the ALJ did not proceed to step five to determine whether there is other work which McGill can perform. Accordingly, the ALJ found that the Commissioner had carried her statutory burden, and that therefore McGill was not disabled for the purposes of the Act. (*Id.* at 22.)

## II. The ALJ Did Not Violate the Treating Physician Rule

McGill objects that the ALJ did not fully credit Dr. Shmukler even though he was a treating physician. (Pl.'s Mem. at 22.) Specifically, he argues that the ALJ should have given

---

[2] Light work is defined as work that entails "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

[3] At the hearing, the vocational expert explained that traffic police officer is listed as medium in the DOT. (Admin R. at 47.) He concluded, however, that McGill performed his job at the light level because he did not have to interact with "perpetrators" or carry the gear that other polices officers do. (*Id.* at 46, 47.)

more weight to Dr. Shmukler's opinion that McGill was limited to lifting 10 pounds.  (*Id.* at 24.)

Under the treating physician rule, a treating source's opinion on the nature and severity of a

claimant's impairments is generally entitled to controlling weight if the opinion is well supported

by medically acceptable clinical and laboratory diagnostic techniques.  20 C.F.R. §

416.927(c)(2).  When an opinion is unsupported, the ALJ is not required to afford deference to

that opinion and may use his discretion in weighing medical evidence as a whole.  *See Halloran*

*v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

Here, the ALJ gave controlling weight to another treating physician, Dr. Lushpenko, who

found that McGill could lift 20 pounds.  The ALJ determined that there is no clear medical

reason for Dr. Shmukler's 10-pound lifting restriction, and found, by contrast, that Dr.

Lushpenko's determination was based on McGill's performance on his nuclear stress test and the

absence of symptoms by October 2013.  (Admin R. at 387–91, 416.)  Although there are some

conflicting findings in the record, the ALJ's determination that McGill can occasionally lift 20

pounds is well supported in the record, and it is the ALJ's task to resolve genuine conflicts in the

medical evidence.  *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *accord Schaal*, 134 F.3d

at 504 ("It is for the SSA, and not this court, to weigh the conflicting evidence in the record.");

20 C.F.R. § 404.1527(c).

## III.     The ALJ Needs to Consider the Mental Demands of McGill's Past Relevant Work

McGill further objects that substantial evidence does not support the ALJ's finding that

he can return to his past work as a traffic control agent.  (Pl.'s Mem. at 17.)  In his reply brief, he

clarifies that he also objects to the ALJ's RFC determination that he can perform a full range of

light work.  (Pl.'s Reply (Doc. No. 20) at 4.)  In support of this argument, McGill notes that the

ALJ did not consider the mental demands of his past relevant work as a traffic control agent.

(*Id.*)  Before this Court can affirm the ALJ's determination, the ALJ must consider the mental demands of McGill's past work to ensure that McGill can, in fact, return to his job as a traffic control agent.  The Court therefore remands on this narrow issue and directs the ALJ to consider whether McGill's RFC should include a low-stress limitation.

Before determining that the claimant can return to his past work, the ALJ must consider "the physical and mental demands of the past job/occupation."  Social Security Ruling 82–62, Title II and XVI:  A Disability Claimant's Capacity to Do Past Relevant Work, In General ("SSR 82–62").  SSR 82–62 admonishes ALJs to collect "detailed information about . . . mental demands and other job requirements" of the claimant's past relevant work.  *Id.*; *see also* 20 C.F.R. § 404.1520(f) (the ALJ must compare the RFC with the physical and mental demands of the claimant's past relevant work).  SSR 82–62 directs that this information "be derived from a detailed description of the work obtained from the claimant, employer, or other informed source."  *Id.*

Here, in an otherwise very thorough opinion, the ALJ did not discuss the mental demands of McGill's past work as a traffic control agent.  At the hearing, the ALJ specifically asked the vocational expert whether McGill's past job is considered stressful.  (Admin R. at 49.)  The expert responded that the DOT lists traffic controller as a stressful job.  (*Id.*)  Having raised this issue, though, the ALJ did not question McGill about the mental demands of his past job.  The ALJ asked McGill about his work at the union, but did not ask him at all about the demands of his job as a traffic control agent.  (*Id.* at 44.)  The decision too provides no insight into the mental demands of McGill's previous work.  Accordingly, remand is appropriate so that the ALJ can discuss or – if need be – further inquire into the mental demands of McGill's past work.  *See, e.g.*, *Collazo v. Colvin*, No. 13-CV-5758 (RJS) (HBP), 2015 U.S. Dist. LEXIS 171732, at *36

(S.D.N.Y. Dec. 22, 2015) (remanding for failure to consider the physical and mental demands of the claimant's past relevant work); *Selmo v. Barnhart*, No. 01-CV-7374 (SHS), 2002 U.S. Dist. LEXIS 21131, at *29 (S.D.N.Y. Oct. 30, 2002) (same).

In considering the mental demands of the work, the ALJ on remand should also consider whether McGill's residual functional capacity should include a low-stress limitation. An amended RFC analysis that specifically addresses the propriety of a low stress restriction will ensure that the record is clear on whether McGill retains the capacity to meet the mental demands of his past job. The current record provides some, albeit limited, evidence that such a restriction is appropriate. Specifically, Dr. Custis found that McGill can return to "low-stress" work, and the Workers' Compensation Board concluded that McGill suffered his heart attack while "under stress." Perhaps having noted this evidence, the ALJ specifically asked the vocational expert whether McGill's past work was stressful. Nevertheless, in his decision, the ALJ does not address whether such a low-stress limitation is warranted.

The Government argues that remand is not necessary here because "there is no reasonable likelihood that correcting the error would change the ALJ's decision." (Def.'s Reply (Doc. No. 21) at 3.) This is not so. To determine whether the RFC should include a low-stress limitation, the Court would need to weigh the evidence in the record, a task that is fundamentally the ALJ's responsibility. *See Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (noting that "it is up to the agency, and not this court, to weigh the conflicting evidence in the record.") The responsibility for determining a petitioner's RFC rests solely with the ALJ. *See* 20 C.F.R. § 404.1546. Similarly, as SSR 82–62 explains, the ALJ must determine whether McGill "retains the functional capacity to perform past work" because it is "an important, and, in some instances, a controlling issue."

23

Accordingly, the Court remands this case so that the ALJ can fully consider the mental demands of McGill's past relevant work. The ALJ should also explicitly determine whether a low-stress limitation is appropriate in this case or not.

## IV.    The ALJ Properly Considered the Physical Demands of McGill's Past Relevant Work

McGill objects that he cannot return to his past work because he was required to lift 50 pounds, and the light work RFC determination suggests that he can only lift 20 pounds. (Pl.'s Mem. at 19.) On a work history report, McGill noted that he "frequently lifted" 50 pounds at his past job. (Admin R. at 182.) However, on that same form, he also noted that the "heaviest weight" he lifted at his former job was 20 pounds. (*Id.*) Both of these assertions cannot be true. The vocational expert confirmed that working as a traffic control agent sometimes entails lifting 20 pounds. (*Id.* at 47.) As the trier of fact, it was reasonable for the ALJ to conclude that McGill lifted a maximum of 20 pounds at his job.

## V.    The ALJ Correctly Assessed McGill's Credibility

A credibility finding by an ALJ is entitled to deference by a reviewing court "because [the ALJ] heard plaintiff's testimony and observed [plaintiff's] demeanor." *Gernavage v. Shalala*, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995). The ALJ must analyze the credibility of a claimant as to her symptoms through a two-step test. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). The ALJ must first decide "whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Id.* (citing 20 C.F.R. § 404.1529(b)). Next, if the ALJ determines that the claimant does have such an impairment, he must consider "'the extent to which the claimant's symptoms can

reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (quoting 20 C.F.R. § 404.1529(a) (alterations omitted)).  When evaluating the "intensity, persistence and limiting effects of symptoms, the Commissioner's regulations require consideration of seven specific, objective factors . . . that naturally support or impugn *subjective* testimony of disabling pain and other symptoms." *Dillingham v. Colvin*, No. 14-CV-105 (ESH), 2015 WL 1013812, at *5 (N.D.N.Y. Mar. 6, 2015). These seven objective factors are:

> (i) [the] claimant's daily activities; (ii) [the] location, duration[,] frequency, and intensity of [the] claimant's pain or other symptoms; (iii) precipitating and aggravating factors; (iv) [the] type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate [the claimant's] pain or other symptoms; (v) treatment, other than medication, [the] claimant receives or has received for relief of her pain or other symptoms; (vi) measures [the] claimant uses or has used to relieve pain or other symptoms; and (vii) other factors concerning [the] claimant's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *5 n.22 (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)).  "While it is 'not sufficient for the ALJ to make a single, conclusory statement that' the claimant is not credible or simply recite the relevant factors, remand is not required where 'the evidence of record permits [the Court] to glean the rationale of the ALJ's [credibility] decision.'" *Cichocki v. Astrue*, 534 F. App'x 71, 76 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)).  In such a case, "the ALJ's failure to discuss those factors not relevant to his credibility determination does not require remand." *Id.*

Here, the ALJ followed the two-step process in considering McGill's symptoms and carefully analyzed McGill's credibility.  (Admin R. 18–20.)  He first found that McGill suffers from a medically cognizable impairment, status post-myocardial infarction.  (*Id.* at 14.)  The ALJ next acknowledged that McGill's heart attack could reasonably be expected to cause the alleged symptoms and noted that "symptoms may sometimes suggest a greater degree of impairment

than can be shown by the medical evidence alone." (*Id.* at 19.) Nevertheless, the ALJ found that McGill's statements regarding the "intensity, persistence and limiting effects of these symptoms are not entirely credible." (*Id.* at 18.)

The ALJ's decision points to ample record evidence to support this credibility determination. The objective findings in the record within 12 months of McGill's heart attack have been "within normal limits" or slightly below normal. (*Id.* at 19.) Though McGill testified that he was bedridden after the December 2013 nuclear stress test, he did not report this complaint to any of his physicians. (*Id.*) Furthermore, his claim that he does not do any of his household chores because of his impairment appears dubious in light of three doctors' conclusions that McGill can return to work. (*Id.*) His medical treatment since his discharge in 2012 has been conservative, and he has not been hospitalized since his heart attack. (*Id.*) Failure to consider other indicia of credibility, such as McGill's work history, does not undermine the ALJ's credibility analysis because, as detailed above, substantial evidence supports the finding. *See Wavercak v. Astrue*, 420 F. App'x 91, 94 (2d Cir. 2011).

## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings (Doc. No. 18) is granted in part, and McGill's motion for remand (Doc. No. 16) is granted in part. This matter is remanded for further proceedings consistent with this opinion. Specifically, the Administrative Law Judge shall:

(1) consider the mental demands of McGill's past relevant work in assessing McGill's residual functional capacity, including whether it should include a low-stress limitation; and

(2) in the event that the Administrative Law Judge finds that McGill cannot return to his

past work, the ALJ shall consider whether McGill can engage in any other kind of

substantial gainful work that exists in significant numbers in the national economy.

The Clerk of Court is respectfully directed to enter judgment consistent with this

Memorandum and Order, and close the file.


SO ORDERED.


Dated: Brooklyn, New York
      March 18, 2018

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge